## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA        :
                                        :
             v.                            :      Nos. 5:17-cr-00556 / 5:20-cr-00248
                                        :
JASON WEIGAND                        :

_____

## **O P I N I O N**

**Defendant's Motion for Acquittal, ECF No.'s 77 in 20-248 and 154 in 17-556 – Denied**

**Joseph F. Leeson, Jr.**                                      **October 4, 2022**
**United States District Judge**

### I.       INTRODUCTION

       Jason Weigand used his position as a financial advisor to take advantage of his clients. He forged their signatures on checks, assumed their identities, misused their money, and accessed one client's private email account without permission. In order to keep the scheme afloat, Weigand used his clients' personal information to open fake accounts in their name without their knowledge and moved client funds between various accounts interchangeably.

       The government criminally charged Weigand with 30 different counts under two separate indictments, and the case went to trial. Trial lasted twelve days and consisted of many hours of testimony from  multiple witnesses, the admission of 19 telephone calls that were recorded by various financial institutions, and thousands of financial records, some of which were reflected in summary charts prepared by the government.

       The jury found Weigand guilty of all 30 counts. In a post-trial motion, Weigand now argues that the jury's verdict should be vacated because some charges against him were not supported by substantial evidence and others lacked evidence of necessary elements. In the alternative, he argues that the Court committed errors during the trial that warrant a new trial. He also argues that the

government failed to disclose evidence that it should have and asks that the Court hold a hearing on that issue. None of Weigand's arguments are persuasive, and the Court denies his motion in its entirety.

## II.     BACKGROUND

Weigand was a registered investment adviser who helped his clients invest their money in various securities and insurance products. However, he abused his position of trust at the expense of several clients[1]—AR, BG, AR, WK, JH and RH, and WP—by, among other things, misusing and misappropriating their money. As a result, a grand jury returned a 24-count indictment against Weigand alleging bank fraud, wire fraud, mail fraud, aggravated identity theft, unauthorized access to a computer, money laundering, and interstate transportation of stolen property (the "17-556 indictment").

Weigand was released on bail on the condition that he not commit any other Federal or State crimes during his release. ECF No. 6 in 17-556. While on release, Weigand traveled to California and induced AH to give him several checks that were meant to be invested for her benefit but that he used for other purposes. As a result, a grand jury returned a separate 6-count indictment charging Weigand with mail fraud, wire fraud, and interstate transportation of stolen securities (the "20-248 indictment").

In general, the two indictments alleged that Weigand devised a scheme to defraud his clients and obtain their money by means of false and fraudulent pretenses, representations, and promises. In order to carry out this scheme, Weigand forged his clients' signatures and assumed their identities to open and manage accounts at various financial institutions. When one client grew suspicious, he accessed her private email without her permission in order read her email correspondence with another financial advisor who encouraged her to report Weigand to the

---

[1] The Court identifies the victims using their initials in this Opinion.

authorities. Throughout the scheme, Weigand employed the use of the mails, the internet, and transported checks across state lines.

The two criminal cases were consolidated for trial.  During trial, the jury heard testimony from the victims and many other witnesses. The jury also listened to 19 recorded telephone calls with financial institutions. In four of the calls, Weigand identified himself and provided personal identifying information. Government witnesses who were familiar with Weigand's voice confirmed that the caller in the first four calls was indeed Weigand. In the other calls, Weigand pretended to be his clients and provided their personal identifying information. The jury also saw numerous charts that summarized thousands of bank records. A summary witness for the government testified that she created the charts using underlying bank records. Weigand presented a defense through presentation of evidence, cross-examination, calling witnesses, and argument by counsel.

The jury found Weigand guilty on all counts charged in both indictments. The jury also found that he committed some of the offenses charged in the 20-248 indictment while he was on release pending trial.

Weigand filed a post-trial motion arguing that his conviction should be reversed or, in the alternative, that he should receive a new trial. *See* Mot., ECF No. 154 in 20-248; 77 in 17-556. In the Motion, he also asks the Court to hold a hearing to address his claim that the government improperly withheld *Brady* or *Giglio* evidence. The government filed a response, *see* Resp., ECF No. 157 in 20-248; 80 in 17-556, and Weigand filed a reply. *See* Reply ECF No. 163 in 20-248; 85 in 17-556.

III.    **LEGAL STANDARDS**

### a. *Motion for Acquittal – Review of Applicable Law*

A convicted defendant may file a motion for acquittal under rule 29 of the Federal Rules of Criminal Procedure. Such a motion "may only be granted where the evidence is insufficient to sustain the conviction." *United States v. Little*, 314 F. Supp. 3d 647, 652 (E.D. Pa. 2018). Courts ask whether the defendant's guilty verdict is supported by substantial evidence. *Id*. Evidence is "substantial" when "a reasonable mind might accept [it] as adequate to support a conclusion." *Shuter v. Astrue*, 537 F. Supp. 2d 752, 755 (E.D. Pa. 2008). When determining whether evidence is substantial, courts "may not weigh the evidence," nor may they "make credibility determinations." *Little*, 314 F. Supp. 3d at 652. Courts must also "consider the evidence in the light most favorable to the government, draw all reasonable inferences in favor of the government, and presume that the jury properly evaluated credibility of witnesses, found the facts, and drew rational inferences." *Id*. (cleaned up). In adjudicating a motion for acquittal, the government's burden is low. It may be met "entirely through circumstantial evidence." *Id*. Indeed, "the verdict must be upheld unless 'no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a doubt.'" *Id*. (*quoting United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987)).

### b. *Motion for a New Trial – Review of Applicable Law*

A defendant may move the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Justice requires a new trial only when errors were made in the first trial, and it is reasonably probable that the verdict was influenced by those errors. *See United States v. Georgiou*, 777 F.3d 125, 143 (3d Cir. 2015). "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (cleaned up). Granting motions for new trials is disfavored, and it should only be done in "exceptional"

cases. *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008). "The defendant bears the burden of proving that a new trial ought to be granted." *United States v. Steptoe, No*. CRIM.A. 01-429-02, 2003 WL 22016866, at *1 (E.D. Pa. June 19, 2003), aff'd, 126 F. App'x 47 (3d Cir. 2005).

## IV.    ANALYSIS

Weigand makes a number of arguments in his Motion. His arguments can be placed into three different categories. In the first, Weigand attacks the evidence supporting nearly every count that he was convicted of. In the second, Weigand highlights two alleged errors that the Court made during trial. In the third, Weigand asks for a hearing on evidence that he believes the government withheld and, according to him, was *Brady* or *Giglio* evidence. None are persuasive.

### 1.  *First Category - Arguments for Acquittal*

Weigand first contends that he is entitled to a judgment of acquittal on all 30 counts that the jury convicted him of under the two indictments. He argues that each count suffers from either insufficient evidence or a complete lack of evidence. Weigand's arguments are unpersuasive for one primary reason: he minimizes and ignores the inculpatory evidence admitted at trial. Weigand essentially wants this Court to reweigh the evidence, but it cannot do that, nor can it second guess the jury's credibility determinations. Instead, the Court must consider all the evidence in a light most favorable to the government and draw all reasonable inferences in the government's favor. In doing that, the court finds that each count is supported by substantial evidence. Thus, Weigand has not met his very high burden of showing that the verdict in this case should be reversed. Since Weigand challenges every count, the Court discusses each one in more detail below.

### a.  **Count 1 in 17-556—Bank Fraud**

Count 1 in 17-556 charged Weigand with bank fraud. Specifically, the government alleged that AR gave Weigand funds for investing for her benefit. Instead of investing those funds, Weigand used the money to open separate accounts at Wells Fargo and Fidelity Investments in the name of a different client, BG. Weigand then forged BG's name on six different checks written on those accounts and used the money for personal and business purposes. Neither AR nor BG approved Weigand's actions. Based on those allegations, the government argued that Weigand violated the federal bank fraud statute. That statute states,

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> Shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

A defendant may be found guilty under either clause. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014). For this count (and each count that charged bank fraud), the government argued that Weigand was liable under the second clause.

The jury verdict form listed count 1 in 17-556 as follows:

> Bank fraud scheme with regard to false, fraudulent, or forged checks, drawn on a Fidelity account in name of an individual identified here as BG, that were presented to and deposited at Wells Fargo Bank.

The jury found Weigand guilty of that count. Under count 1 in 17-556, the jury verdict form also included the following special interrogatory:

> If you find the defendant guilty of this Count, answer the following question. If you find the defendant not guilty of this Count, skip the following question.
> Do each of you unanimously agree that the scheme included check number 1021, which is Government exhibit 418?

The jury answered that question in the affirmative.

Weigand contends that his conviction on this count should be reversed for three reasons.

First, he argues that the 17-556 indictment commingles the two clauses of the federal bank fraud statute in a way that might have confused the jury. He reasons that "there is no way of knowing what the jury convicted" him of on this count. Mot. 8. The Court is not persuaded.

The evidence presented at trial supported the government's theory brought under the second clause. That is, that Weigand obtained money that was under the control of a financial institution by means of false or fraudulent pretenses. Weigand even acknowledges in his Reply that "the jury was instructed only on Section 1344(2)" (the second clause). Reply 10. The Court also instructed the jury that "each of you must agree with each of the other jurors that the same scheme or plan to defraud alleged in each count was in fact employed by Weigand." Thus, there is no reason to believe that the jury was confused or did not unanimously find Weigand guilty of bank fraud under the second clause.

Second, Weigand argues that the 17-556 indictment violates the federal bank fraud statute's "textual limitation on the reach of bank fraud." Mot. 7. Weigand, however, leaves it at that. He does not elaborate further on how or why the indictment violates the so called "textual limitation." Nor does he point out what the apparent problematic language is. He simply asserts that this "textual limitation" has been violated and cites to *Loughrin v. United States*, 573 U.S. 351 (2014).

In *Loughrin*, the Supreme Court did hold that the second clause of the bank fraud statute has "a significant textual limitation on" its reach. *Id.* at 362. The Supreme Court explained that under the second clause, "it is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement." *Id*. He "must acquire (or attempt to acquire) bank property 'by means of' misrepresentation." *Id*.

Weigand details this argument somewhat in his Reply. He seems to argue that his conviction cannot stand under the second clause because the second clause applies only to frauds committed

"directly" on a bank and that he did not defraud a bank because the checks he deposited were all valid. *See* Reply 11. Weigand's argument ignores the facts of this case.

The government introduced six checks into evidence that purported to have been endorsed by BG, but BG testified that he did not endorse the checks. He also testified that the address used to open the accounts at issue was not his address. Thus, contrary to Weigand's assertions, there is evidence that the checks were not valid and that a fraud—false checks and false information for opening accounts—was committed directly on a bank. Based on those checks, the financial institutions released money under their control to Weigand, which he used for personal and business-related purposes. A reasonable jury could therefore conclude, and did conclude in this case, that Weigand executed a scheme to obtain, and did obtain, moneys that were under the control of a financial institution by means of false presentations and false representations.

Third, Weigand argues that this count must be overturned because the government failed to introduce evidence that he obtained moneys from a "financial institution" as that term is defined in the federal bank fraud statute. Under the statute, there are ten specific types of entities that qualify as a "financial institution."[2] *See* 18 U.S.C. § 20. In prosecuting bank fraud cases, the government commonly meets this element by proving that the defrauded bank is insured by the FDIC.

---

[2]       "As used in this title, the term 'financial institution' means--
(1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);
(2) a credit union with accounts insured by the National Credit Union Share Insurance Fund;
(3) a Federal home loan bank or a member, as defined in section 2 of the Federal Home Loan Bank Act (12 U.S.C. 1422), of the Federal home loan bank system;
(4) a System institution of the Farm Credit System, as defined in section 5.35(3) of the Farm Credit Act of 1971;
(5) a small business investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662);
(6) a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act;
(7) a Federal Reserve bank or a member bank of the Federal Reserve System;
(8) an organization operating under section 25 or section 25(a) of the Federal Reserve Act;

The 17-556 indictment references throughout that the accounts at issue were at Wells Fargo, and the government introduced evidence to prove that Wells Fargo is FDIC insured. However, Weigand points out that the accounts were actually at Wachovia Bank during the scheme and alleges that Wachovia Bank did not become a part of and convert its name to Wells Fargo until April 19, 2011. Thus, at the time of the 17-556 indictment—October 12, 2017—the accounts at issue were at Wells Fargo. When Weigand forged and deposited the checks at issue, however, the financial institution was still named Wachovia Bank. Weigand argues that the misnomer is fatal to this count because "[n]o FDIC certificate for Wachovia Bank was entered into evidence." Mot. 15.

It is true that the government did not provide an FDIC certificate for Wachovia Bank, but there was other evidence admitted during trial that Wachovia qualifies as a financial institution covered by the federal bank fraud statute. First, Wachovia's signature card states that it was a "financial institution" under federal law. *See* Government Ex. 30. Second, a representative from Wells Fargo testified that she worked for Wachovia prior to its merger with Wells Fargo and also testified that Wachovia was fully FDIC insured. Weigand did not challenge that testimony. Nor did he argue at any time during the trial that the government failed to prove that the financial institutions named in the indictments were not "financial institutions" covered by the federal bank fraud statute. Thus, even though the government did not introduce Wachovia's FDIC certificate, there was other substantial evidence admitted to support that Wachovia was a financial institution as that term is defined under the federal bank fraud statute such that a reasonable jury could find the same.

---

(9) a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); or

(10) a mortgage lending business (as defined in section 27 of this title) or any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974."

18 U.S.C. § 20.

Fourth, Weigand argues that his conviction under count 1 in 17-556 cannot stand because the statute of limitations has run on a majority of the forged checks listed under this count. The statute of limitations for bank fraud is ten years. *See* 18 U.S.C § 3293. However, "where an indictment charges a bank fraud scheme premised on multiple deposits at a financial institution, the Third Circuit has found that each deposit is an execution of the scheme." *United States v. Weigand*, No. 5:17-CR-00556, 2021 WL 1424728, at *4 (E.D. Pa. Apr. 15, 2021) (*citing United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir. 1990)).

In this case, at least one of the forged checks listed in the 17-556 indictment is inside the ten-year statute of limitations—check number 1021. The jury unanimously found that Weigand's bank fraud scheme included check number 1021. Thus, it matters not that the other checks that made up the scheme were deposited more than ten years prior to the 17-556 indictment. Since check number 1021 was a part of the scheme, and it was deposited on or about November 1, 2007, within the statute of limitations, the clock had not run on Weigand's overall scheme charged in this count.

In sum, none of Weigand's arguments for acquittal as to count 1 in 17-556 are persuasive. There is substantial evidence to support Weigand's conviction under this count.

### b. Counts 2–3 in 17-556—Bank Fraud

Counts 2 and 3 in 17-556 charged Weigand again with bank fraud. Specifically, the government alleged that Weigand deposited two forged checks into his accounts at Wells Fargo and Fulton Bank. Both checks were written on a T. Rowe Price account that Weigand set up in AR's name and which had been funded with AR's money. AR did not, however, authorize the checks.

Weigand contends that the jury's guilty verdict for these counts should be overturned. However, none of his arguments as to these counts are unique from his arguments to count 1 in 17-556, which the Court has already addressed and rejected. *See supra* IV(1)a. Thus, the Court will not repeat its analysis here again. In sum, both counts 2 and 3 in 17-556 are supported by substantial

evidence because AR testified that she did not sign or authorize the checks that purported to bear her signature. Also, the checks were made out to Weigand or to one of his business entities and were deposited into accounts under his control.

### c.  Count 4 in 17-556—Wire Fraud

Count 4 in 17-556 charged Weigand with wire fraud. Specifically, the government alleged that Weigand's client, AR, became suspicious of him and asked for a full accounting of her assets. When he could not deliver, she fired him. In an effort to win AR back as a client, and to keep her from discovering the truth about her supposed investments, Weigand created an account at Charles Schwab in AR's name without her knowledge. He then funded the Schwab account with money belonging to other clients, WK and J&RH.

In order to open the bogus Schwab account in AR's name, Weigand used the internet to transmit an application to Charles Schwab on October 15, 2012. Weigand was in Pennsylvania at the time, and he sent the application materials to a state other than Pennsylvania. Based on these allegations and the evidence presented at trial, the jury found that Weigand had violated the federal wire fraud statute. That statute states, in part,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18. U.S.C. § 1343.

In order for a defendant to be convicted of wire fraud, there must be evidence that they transmitted or caused to transmit something. Proof that a defendant used the internet satisfies that element because the internet "is an instrumentality of interstate commerce." *United States v. Fumo*, No. CRIM.A.06-319, 2009 WL 1688482, at *9 (E.D. Pa. June 17, 2009).

Weigand contends that his conviction on this count should be reversed for two reasons.

First, Weigand argues that there was no evidence presented at trial that he used interstate wire communications. He is wrong. A representative from Charles Schwab testified that the internet was used to send the application material needed to open the account. The representative also testified that Schwab received the material in Arizona. Moreover, the government produced Weigand's bank records, which showed that he made multiple purchases in Pennsylvania on the same day that he sent the false application to Schwab. The jury also heard testimony that Weigand's office was located in Pennsylvania. The Court could go on, but on that evidence alone, a reasonable jury could find that Weigand submitted the false application from Pennsylvania and used the internet to transport it across state lines to Arizona.

Second, Weigand argues that the application to open the Schwab account did not violate the wire fraud statute because he opened the account to send money to AR, not to defraud her. Relying entirely on *Grunewald v. United States*, 353 U.S. 391 (1957), Weigand asserts that any efforts to conceal his theft from AR, such as opening the Schwab account, are not part of the accomplished scheme to defraud and therefore cannot support a conviction of wire fraud. However, Weigand's reliance on *Grunewald* is misplaced.

In *Grunewald*, the Supreme Court explained that "after the central purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that conspirators took care to cover up their crime in order to escape detection and punishment." *Id.* at 401–02. *Grunewald* therefore dealt with conspiracy, which is not an issue in this case.

Here, a reasonable jury could determine that Weigand used false or fraudulent pretenses in order to open the Schwab account for the purposes of continuing to defraud his clients, not just AR. In other words, Weigand's argument that his scheme to defraud AR had come to fruition, and that the false Schwab account opened in AR's name was not used to defraud her further, misconstrues

the nature of the indictment. *See United States v. Frey*, 42 F.3d 795, 798 (3d Cir. 1994). If AR had blown the whistle on Weigand, then his ongoing scheme to defraud her and other clients would have come to an end. Weigand opened the bogus Schwab account to keep that from happening. The bogus account covered his past fraud against AR and allowed him to continue to defraud her and other clients. Thus, the opening of the false Schwab account was "incident to an essential part of [his] scheme" to continue defrauding her and other clients. *See id.* at 798 (*quoting United States v. Ruuska*, 883 F.2d 262, 264 (3d Cir. 1989)).

In sum, there is substantial evidence to support Weigand's conviction on this count, and he has not met his extremely high burden to persuade the Court otherwise.

### d.  Count 5 in 17-556—Wire Fraud

Count 5 in 17-556 charged Weigand again with wire fraud. Specifically, the government alleged that on October 17, 2012, Weigand called Schwab and pretended to be AR (Schwab's caller ID reported that the incoming call belonged to Weigand). During this call, he provided Schwab with AR's identifying information and assumed her identity in order to manage the account. He made the call while he was in Pennsylvania, and a Schwab representative he spoke with was in a state other than Pennsylvania. Based on these allegations and evidence presented at trial, the jury found Weigand guilty under this count for wire fraud.

Weigand contends that his conviction on this count should be overturned for four reasons, all of which relate to the recorded phone call.[3]

First, he argues that the witness representative from Schwab explained that there are "multiple explanations for why and how a number could be captured by Schwab's Caller ID system." Mot. 6. According to Weigand, the representative's testimony means his caller ID could

---

[3]      Weigand also repeats his argument under this count that he was sending AR money, not defrauding her. The Court dealt with that failed argument already, so it will not repeat itself here. *See supra* IV(1)c.

have been captured by Schwab's system by mistake. This argument fails because it requires the Court to reweigh the evidence.

The jury heard testimony regarding how various financial institutions such as Schwab captured the telephone number of incoming calls. On many of the calls admitted into evidence—calls with purportedly different callers—the financial institutions captured the same number, which had ties to Weigand. The government argued that the captured numbers, among other things, proved that Weigand was making the calls and pretending to be his clients.

On cross examination, counsel for Weigand posed a series of hypotheticals to representatives from the financial institutions that involved three-way calls and then asked which number the financial institution's system would capture. For example, if person "A" calls person "B", and then "A" calls the financial institution while "B" is still on the line, who's number will be captured, "A's" number or "B's" number? The witness testified that in that scenario, the system would capture the number belonging to person "A." According to Weigand, this means his number could have been captured by mistake.

Weigand's argument goes to the weight of the evidence, which is something the jury considered in light of all the other evidence admitted. Ultimately, the jury found Weigand guilty of this count, which means they determined that he was truly the person who called Schwab on October 17, 2012, and was pretending to be one of his clients as part of a scheme to defraud or obtain money or property. The jury therefore was not convinced by Weigand's arguments that his number could have been captured by mistake or they found other evidence that suggested he was the true caller to be more convincing. Either way, the Court cannot second guess the jury's finding because it is supported by substantial evidence.

Second, Weigand argues that the government did not introduce telephone records to show that the call was interstate. There was, however, plenty of other evidence introduced that proves this

call was interstate. As the Court mentioned, Weigand's bank records show that he made purchases in Pennsylvania around the time the call was made. The jury also heard testimony that his office was in Pennsylvania. The Schwab representative testified that Schwab did not have a call center in Pennsylvania at the time the call was made. The Court go into more, but that alone qualifies as substantial evidence that the call was interstate.

Third, Weigand argues that no witnesses identified the "female" voice from this call, or the other calls, as his voice. Although that is true, it is hardly dispositive. AR testified that she did not make the call and that it is not her voice on the call. She also testified that she did not authorize Weigand to make the call for her. The caller gave Schwab AR's personally identifiable information, which Weigand had access to as her financial advisor. These facts and other circumstantial evidence constitute substantial evidence that Weigand was the true caller, especially when considered alongside the other admitted calls.

Fourth, Weigand argues that tasking the jury with identifying the voice in this call and other calls violated rules 606, 701, and 901 of the Federal Rules of Evidence.

Rule 606 states that a "juror may not testify as a witness before the other jurors at the trial. If a juror is called to testify, the court must give a party an opportunity to object outside the jury's presence." This rule has no relevance because no juror testified as a witness.

Rule 701 deals with opinion testimony by lay witnesses.  As Weigand himself acknowledges, no lay witness testified that the "female" voice on the call belonged to Weigand, so this rule has no applicability.

Rule 901 makes a little more sense in the context of this case, but it doesn't help Weigand either. Rule 901 states that in order to authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The rule also states that a person's voice may be identified through opinion "based on hearing the

voice at any time under circumstances that connect it with the alleged speaker." *Id.* at (b)(5). Similar to rules 606 and 701, rule 901 is applicable to testifying witnesses and deals with ways of authenticating evidence for admission. For this call, and the other calls in which Weigand pretended to be his clients, the government authenticated the calls in ways other than offering opinion about who the voice of the call belonged to.[4] In other words, this rule is inapplicable here because it does not govern how the jury weighs evidence once it has been authenticated and admitted. Nevertheless, Weigand argues that the jury could not have identified him as the caller charged in this count because they were not familiar with his voice. That argument might be persuasive if this call was the only call that the jury heard.

However, the jury listened to 18 other calls in addition to the call charged in this count. In the first four calls, the caller identified himself as Weigand. The caller also provided personal identifying information that is tied to Weigand, such as ID numbers with the financial institution that belong to Weigand, a fax number that is related to Weigand, Weigand's social security number, and the email address "jasonweigand@comcast.net." The number that these calls came from also belonged to Weigand. Most importantly, Weigand's clients testified that they were familiar with Weigand's voice and that the caller from the first four calls sounded like Weigand. For example, after listening to one of the first four calls in which Weigand identifies himself in the call, WP testified that he "recognize[d] Mr. Weigand's voice" as the caller. Under these circumstances, the jury was properly tasked with finding whether the caller in the first four calls was actually Weigand. The jury could then properly compare the caller from the first four calls with the callers from the remaining calls to determine whether it was the same caller. *See United States v. Fearon-Hales*, 224

---

[4] The Court notes that in addition to authenticating the calls through various means that were not opinion testimony on voice recognition, the government also offered opinion testimony to authenticate and identify the caller's voice in *some* of the calls where Weigand impersonated a male client. For example, in one call where Weigand pretended to be WP, a male client, WP testified that the caller's voice sounded like it belonged to Weigand.

F. App'x 109, 112 (2d Cir. 2007); *see also United States v. Vento*, 533 F.2d 838, 865 (3d Cir. 1976) ("In fact, it is not necessary to present direct evidence to identify the intercepted voice. Circumstantial evidence has often been employed to identify callers on tapped lines. Accordingly, we believe that the questions of weight and sufficiency of the evidence relating to the identification of [the defendant's] voice were matters for the jury.").

Moreover, the context of the calls also supports the jury's finding that Weigand was the one true caller in this call and the others. For example, in the call charged in this count, the imposter caller knew that the Schwab account had been funded with a cashier's check—a cashier's check that had been purchased by Weigand. Indeed, the jury did not consider this call in a vacuum. When considered alongside the other calls, this call fits the pattern and supports the government's theory that Weigand impersonated his clients more than once.

In sum, this count is supported by substantial evidence because a reasonable mind might accept that Weigand was the true caller, that the call crossed state lines, and that it was part of a scheme to defraud money.

### e.   Count 6 in 17-556—Wire Fraud

Count 6 in 17-556 is another wire fraud charge based on a recorded phone call. The government alleged that on October 23, 2012, Weigand again called Schwab pretending to be AR as part of a scheme to defraud money. The jury found him guilty of this count. Weigand makes several arguments why this count should be overturned, but none of them are different from arguments that the Court has already addressed. Thus, the Court moves on to the next count.

### f.   Count 7 in 17-556—Wire Fraud

Count 7 in 17-556 is a wire fraud charge based on a sent fax. The government alleged that on October 23, 2012, Weigand sent a fax from Pennsylvania to Schwab in Arizona for the purposes of obtaining money through fraud. Weigand argues that his conviction under this count should be overturned because there is no evidence that the fax involved an interstate wire communication. Contrary to Weigand's assertion, there is a mountain of evidence that supports the jury's finding that the fax was an interstate wire communication.

The fax itself was admitted at trial, which bore a cover sheet that showed it was transmitted to a number that the Schwab representative recognized as Schwab's incoming fax number. It also bore at the top of each page a fax header line, which included the date, time, and the word "FAX." In an October 24, 2012, telephone call related to the faxed record, Weigand, pretending to be AR, admitted that he had faxed the requested information. On October 23, 2012, Weigand made a separate call to Schwab from his landline telephone number, which was assigned to his Pennsylvania home, which he used as an office. On the recording of that telephone call, Weigand can be heard shuffling through papers to find AR's tax return. Those papers presumably were kept in his office, which is in Pennsylvania. Indeed, when agents executed a search warrant at his home-office, they found paperwork related to Weigand's financial advisory work. Finally, a representative of Schwab testified at trial that Schwab received the fax at its facility in Arizona. Thus, the jury's conclusion that this fax involved an interstate wire from Pennsylvania to Arizona is well supported by the evidence.

### g.  Count 8 in 17-556—Mail Fraud

Count 8 in 17-556 charged Weigand with mail fraud. The government alleged that Weigand used the mail to send a check to Schwab in the amount of $40,250. The check funded the bogus Schwab account opened in AR's name but came from a different client of Weigand's. The jury found Weigand guilty of this count.

The mail fraud statute is nearly identical to the wire fraud statute except that it requires the use of the mails. Thus, the elements to establish mail fraud are: 1)  a scheme to defraud; 2) the use of the mails; and 3) fraudulent intent. *See* 18 U.SC. § 1341. Weigand argues that his conviction under this count must be overturned because there is no evidence that the mails were used to send the check.[5] Weigand is wrong.

In the October 17, 2012, telephone call to Schwab, Weigand, pretending to be AR, stated that he "overnighted" the check to Schwab. Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the government, a reasonable jury could find that Weigand's use of the term "overnighted" means that he used a commercial carrier, such as FedEx, to have the check delivered overnight. The alternative would be that Weigand drove through the night in order to "overnight" the check and delivered it to Schwab in person. But that scenario goes against common sense and is also contrary to what Weigand said himself in the October 17, 2012, call. In that call, Weigand shared his intentions to deposit more checks in the future, and he asked, "I overnighted the first check, but is it better to drop it off at a branch or have it dropped off?" Weigand's question implies that he did not drop off the first check in person. Thus, the only reasonable inference that a jury could make is that Weigand used the mails to "overnight" the check. *See Little*, 314 F. Supp. 3d 647, 652 (E.D. Pa. 2018) (explaining that the government's burden may be met entirely through circumstantial evidence).

In sum, this count is supported by substantial evidence because a reasonable mind might accept that Weigand used the mails to send the check and that the check was part of a scheme to defraud.

---

[5]     Weigand also raises an additional argument for overturning this count in his Reply. Specifically, he argues that mailing the check was not in furtherance of a "scheme to take clients' money" because it was deposited into an account that was opened for AR. This argument is similar to one of Weigand's argument for overturning count 4 in 17-556, and it is unpersuasive for the same reasons. *See supra* IV(1)c.

### h.  Count 9 in 17-556—Mail Fraud

Count 9 charged Weigand with mail fraud. As far as the Court can tell, it appears that this is the one count Weigand does not challenge. Thus, the Court notes only that his conviction on this count, like the others, is supported by substantial evidence.

### i.  Counts 10–12 in 17-556—Aggravated Identity Theft

Counts 10–12 in 17-556 charged Weigand with aggravated identity theft based on several phone calls to financial institutions, in which Weigand assumed his clients' identities and provided their personal information, such as their dates of birth. The applicable statute criminalizes the knowing transfer, possession, or use of a means of identification of another person without lawful authority in relation to mail, wire, or bank fraud. *See* 18 U.S.C. § 1028A. Weigand does not make any new arguments for overturning these counts that the Court hasn't dealt with already.

Specifically, he re-asserts his argument that the jury improperly identified him as the caller in the charged calls. As the Court has explained, it was not improper or unreasonable for the jury to find that Weigand was the caller for all 19 calls. In the first four calls, the caller identifies as Weigand and provides other identifying personal information that is related to Weigand. The same phone number, fax number, and email address link many of the other calls even though they were purportedly made by different people. Each of the victims who were impersonated in the other calls testified that they did not make the calls and that the voice recorded on the call is not theirs. Each of the victims were Weigand's clients. WP also testified that the caller's voice "sounds like Mr. Weigand" after listening to a recorded call where the caller purported to be WP. The calls were played back-to-back so that the jury could compare the voices in each call. It would not be unreasonable for the jury to infer that Weigand was the one true caller on each of the calls. Indeed, the jury's finding that Weigand impersonated his clients is supported by substantial evidence.

### j.  Counts 13–16 in 17-556—Unauthorized Access to a Computer

Counts 13–16 charged Weigand with unauthorized access to a computer. The government alleged that Weigand accessed and printed emails from AR's Yahoo! email account without her permission on multiple occasions. Agents recovered dozens of AR's printed emails in Weigand's home upon executing a search warrant. These printed emails had headers or footers that identified their source as AR's Yahoo! account and established the date they had been viewed and printed. Agents also discovered that some of these emails had been printed by Weigand while he was using an anonymizing proxy service called "Proxify," in an effort to hide his IP address. Among the email correspondence accessed and printed by Weigand was an email to AR from another financial advisor. The advisor suggested alerting law enforcement if Weigand could not immediately produce account statements showing where AR's money was being kept (it was a few days later that Weigand opened the fraudulent Schwab account discussed previously).

Under the relevant statute, it is a crime to "intentionally access a computer without authorization or exceed[] authorized access, and thereby" obtain "information from any protected computer." 18 U.S.C. § 1030(a)(2). The definition of "protected computer" includes any computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2). Based on the above, the jury found Weigand guilty of all these counts of unauthorized access to a computer.

Weigand makes six arguments for overturning some or all of these counts.

First, he argues that he did not access a "protected computer" as that term is defined in the statute because he used his own computer to access AR's Yahoo! Email account. If the Court accepted Weigand's interpretation of the statute, then individuals could hack into Yahoo's servers, and any protected computer for that matter, so long as they did so remotely on their own device. According to Weigand, he could only be liable under this statute if he physically went to the Yahoo! servers and accessed them the old-fashioned way. Of course, Weigand would be liable under the

statute if he physically accessed the Yahoo! servers with his own two hands in person. But he is just as liable for accessing the servers remotely from his own computer.

To be clear, the "protected computer" that Weigand accessed are Yahoo's email servers, which qualify as a "protected computer" under the statute. *See Abu v. Dickson*, No. CV 20-10747, 2021 WL 1087442, at *5 (E.D. Mich. Mar. 22, 2021) (explaining that most courts agree that email accounts are a protected computer and collecting cases) *see also Mahoney v. DeNuzzio*, No. CIV. 13-11501-FDS, 2014 WL 347624, at *5 (D. Mass. Jan. 29, 2014) (holding that Yahoo! accounts may qualify as a protected computer); *Fla. Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1285 (S.D. Fla. 2020) (holding that a university's email server qualified as a protected computer). Indeed, the statute states that "the term 'computer' means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such a device." 18 U.S.C. (e)(1). Yahoo's servers are covered by that broad definition.

Weigand's second argument is similar to his first. He argues that he accessed Yahoo's servers with authorization because he had a Yahoo! account himself. Similar to his first argument, this one too would lead to disastrous results if accepted. According to Weigand, anyone with a Yahoo! account has authorization to access any other person's Yahoo! account: your neighbor's account; your co-workers' accounts; the account of a stranger sitting next to you on the bus. Of course, that is not the case. Weigand may have had authorization to access his own Yahoo! email account on Yahoo's servers, but that access does not extend to the accounts belonging to other individuals stored elsewhere on Yahoo's servers. Thus, even if Weigand had authorized access to his own personal Yahoo! account, he exceeded that authorized access when he accessed AR's Yahoo! account. Indeed, the statute criminalizes unauthorized access *and* the exceeding of

authorized access. *See Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021) ("an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him"). If Yahoo! intended to provide its users with unfettered access to every account stored on its servers, then it wouldn't require its users to create unique passwords to protect their personal accounts, which leads to Weigand's third argument.

Third, Weigand argues that he did not access a computer without authorization because there was conflicting testimony that AR gave him the password to her email account. But that is not true. AR testified that she did not give Weigand her password to her email account and that she did not authorize him to access her email account. Even if there was conflicting testimony that AR gave Weigand her email password, the jury is entitled to weigh the conflicting evidence to find what the facts are. Indeed, that is the jury's main purpose. Thus, even if the Court assumed that there was conflicting evidence here, that is not reason to overturn the jury's conviction.

Weigand's fourth argument is specific to count 13. He argues that count 13 is time barred. The original indictment bringing count 13 was returned on October 12, 2017, which charged Weigand with accessing three of AR's emails on October 12, 2012. That date is within the limitations period for unauthorized access. The three emails, however, were sent to AR on September 17, 18, and 28 of 2012. All those dates fall outside of the limitations period, and Weigand asserts that the October 12, 2012 date stamp on the printed emails shows when they were *printed*, not when they were *accessed* from Yahoo's servers. According to Weigand's theory, he could have accessed the emails on a day outside the limitations period, say on September 28, 2012, and then left the emails open on his computer screen for two weeks before getting around to printing them. If that were the case, then he did not actually access the protected computer on the same day he printed the emails.

However, the government's expert witness refuted that theory by testifying that the date stamp shows when the emails were printed *and* when they were accessed from the servers. But even if the Court ignored that testimony, Weigand's theory merely leaves open the possibility that he did not access the servers on the same day that he printed the emails. Perhaps a jury might accept such a theory, but that does not mean that the jury in this case was required to do so. A reasonable jury could find that Weigand accessed the emails and printed them on the same day even absent the testimony from the government's expert witness.

Weigand's fifth argument, which relates to an amendment to the 17-556 indictment, is specific to count 14, which charged Weigand with accessing several of AR's emails on December 10, 2012. Weigand has raised this issue before, so it is not a new argument. The government and Weigand even submitted briefs on the matter of amending the 17-556 indictment, and the Court ruled in favor of the government on this issue from the bench for the reasons stated on the record. Nevertheless, the Court will address this issue again in this Opinion.

A prior version of the 17-556 indictment charged Count 14 as follows:

| Count | Approximate Date of Access | Description of Email Accessed |
|-------|---------------------------|-------------------------------|
| 14. | December 10, 2012 | Email of December 4, 2012 from AR to Advisor SH; Email of December 8, 2012 from AR to Advisor SH; Email response of AR to email of December 13, 2012 from Advisor SH to AR; |

ECF No. 44 in 17-556.

Under the prior version, the jury could have convicted Weigand of unauthorized access to a computer by finding that he accessed any one of three separate emails described in the 17-556 indictment. The third email listed, however, had a date that was after the approximate date of access. Thus, the jury could not have found Weigand guilty of count 14 by way of the third email.

The government recognized this as a typo and moved to amend the 17-556 indictment (it appeared that the third email listed had accidently been copied and pasted from count 15 because the same exact email description was also listed under that count).

The government's proposed amended indictment removed the third email listed but was otherwise the exact same in every single way:

| Count | Approximate Date of Access | Description of Email Accessed |
|-------|----------------------------|-------------------------------|
| 14.   | December 10, 2012          | Email of December 4, 2012 from AR to Advisor SH;<br>Email of December 8, 2012 from AR to Advisor SH;<br>~~Email response of AR to email of December 13, 2012 from Advisor SH to AR;~~ |

ECF No. 150 in 17-556.

After the Court received briefs on the matter and heard argument, it granted the government's request to amend the 17-556 indictment. Weigand now re-asserts his argument that the government should not have been allowed to amend the 17-556 indictment and that his conviction under count 14 should therefore be overturned. Weigand's argument is again rejected.

The amendment to the 17-556 actually benefited Weigand because it gave the jury one less email that they could have convicted him of accessing under count 14. Weigand claims that he could have made an "impossibility" argument against the third email if it had remained on the indictment. That's true, but there are still the other two emails listed under count 14. Besides, removing the third email took it from the jury altogether, saving Weigand from having to make any argument against it at all. Thus, the Court did not err by granting the government's request to amend the 17-556 indictment because the amendment did not prejudice Weigand. Also, the amendment saved the jury from unnecessary confusion and ensured that the jury did not convict Weigand under a factual impossibility. *See United States v. Miller*, 471 U.S. 130, 145 (1985) (holding that when an

indictment "charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury's consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment in the indictment").

Sixth, Weigand argues that the rule of lenity should be applied to the applicable statute here. The rule of lenity provides that "an ambiguous criminal statute is to be construed in favor of the accused." *Staples v. United States*, 511 U.S. 600, 619 n. 17 (1994). Weigand, however, does not elaborate on why or how the rule of lenity should have been applied to the applicable statute in this case. Weigand was charged with unauthorized access to a computer under 18 U.S.C. § 1030(a)(2). That section creates criminal liability for anyone who "intentionally accesses a computer without authorization." *Id.* There is nothing ambiguous about the language of the statute. Weigand either had authorization to access the Yahoo! email account or he did not. Thus, Weigand does not meet his extremely high burden with this argument to reverse his convictions under the unauthorized access counts.

In sum, there is substantial evidence to support Weigand's convictions under each count of unauthorized access because a reasonable mind might accept that Weigand accessed a protected computer, Yahoo's servers, without authorization on multiple occasions and obtained AR's emails.

### k.  Counts 17–20 in 17-556—Money Laundering

Counts 17–20 charged Weigand with money laundering. The government alleged that on four separate occasions, Weigand withdrew client money from his Fulton Bank business account using a combination of cashier's checks and cash and then immediately deposited that same money into a Sovereign Bank business account. In each case, client funds were used to pay for a check that was made out to Weigand's business and for a cash withdrawal that were then redeposited into another business account belonging to Weigand at a different bank. The government argued that the

withdrawn funds were the product of mail, wire, or bank fraud and that the subsequent deposits into different accounts were for the purpose of concealing the fact that the funds belonged to clients.

The money laundering statute that the jury convicted Weigand under for these counts criminalizes the act of knowingly engaging in a financial transaction that is designed in whole or in part "to conceal or disguise the nature, the locations, the source, the ownership, or the control of" proceeds from an unlawful activity. 18 U.S.C. § 1956(a)(1)(B). Weigand argues that his conviction under these counts should be reversed for four reasons.

First, Weigand argues that the 17-556 indictment suffers from a critical factual error that warrants acquittal. The 17-556 indictment alleged that the four transactions in these counts were deposited into Santander Bank. However, Weigand points out that the deposits were actually made at Sovereign Bank and that Santander did not merge with Sovereign until October 2013, one year after the transactions were made. That argument fails for two reasons. First, this is the first time Weigand has raised this argument. Thus, he waived this argument by not raising it before trial. *See* Fed. R. Crim. P. 12(b)(3)(B). Second, the argument fails on the merits because the 17-556 indictment included Sovereign Bank as the predecessor of Santander Bank. *See* ECF No. 150, Count One, ¶ 40.

Weigand's next argument for reversing his conviction under these counts is that the transactions were "fully documented" and legitimate transactions that were not made with the intent to conceal or disguise the location, source, ownership, or control of the proceeds. In other words, Weigand disagrees with the jury's finding that the transactions constituted money laundering. It is not, however, the Court's place to intrude on the jury's role of determining questions of fact simply because Weigand is unhappy with the jury's finding. *See United States v. Hart*, 693 F.2d 286, 288 (3d Cir. 1982).

Third, Weigand argues that "there is no allegation that these particular deposits were proceeds, as required by statute, from any other 'specified unlawful activity' which definition includes bank fraud." Mot. 12. Weigand is mistaken. The 17-556 indictment alleged that the deposits listed in each count "involved the proceeds of a specified unlawful activity, that is, mail fraud, wire fraud, and bank fraud." ECF No. 150, Counts 17–20, ¶ 4. The government fleshed this allegation out more during trial. Specifically, the theory presented to the jury was that Weigand induced his clients to give him money with the belief that he would invest it for their benefit. In reality, he misused their money, committing the unlawful activities specified in the 17-556 indictment during the process.

Fourth, Weigand contends that the money laundering charges merge into the fraud charges. He argues that charges of money laundering must be separate from the unlawful activity that produces the proceeds that are laundered. Assuming that is true, there is no merger problem here because the four transactions charged under these counts were not essential elements of the underlying unlawful activity that produced the laundered proceeds. In other words, there is a clear delineation between the money laundering charges and the underlying unlawful activity that produced the proceeds that were laundered. The underlying fraud offenses were complete once Weigand induced his clients to give him their money for investing and then deposited the money into accounts not used for investment purposes. He then took that money and moved it to different accounts in an attempt to disguise the true source and ownership of the funds, which is the separate and distinct crime of money laundering.

In sum, counts 17–20 are supported by substantial evidence because a reasonable mind might accept that Weigand facilitated the charged transactions to conceal or disguise the source or ownership of proceeds from an unlawful activity.

l.   **Counts 21–24 in 17-556—Bank Fraud**

Weigand does not make any unique arguments for overturning these counts that the Court has not already addressed and rejected. Thus, the Court moves on to Wiegand's next argument.

m. **Counts 1–2 in 20-248—Mail Fraud**

Counts 1–2 in 20-248 charged Weigand with mail fraud. These counts, as well as the remaining counts in the 20-248 indictment, relate to Weigand's client, AH. The government alleged that Weigand convinced AH to give him money for the purpose of investing it for AH's benefit but in reality, he used AH's money for other purposes. Weigand did not disclose to AH that he was no longer a licensed financial advisor. Nor did he disclose that he was out on bail pending trial for the 17-556 case.

These two counts alleged specifically that Weigand induced AH to give him two checks that were generated online through Bank of America's portal, and which were then mailed to Weigand and deposited by him into an account he controlled. Weigand argues that these two counts should be overturned because there is no evidence that the two checks were mailed to him. The Court disagrees.

AH testified that she directed Bank of America to send Weigand the two checks. She also testified that Bank of America's check-issuing system included the drafting and mailing of checks. The jury also saw several text messages between Weigand and AH. Those messages showed that, on March 31, 2016, Weigand gave his mailing address to AH. AH testified that Weigand provided his mailing address so she would know where to direct Bank of America to mail the $40,000 check for investment purposes. AH responded via text that she was in Charleston, South Carolina, but that she had sent Weigand the $40,000 check. The check itself bore the mailing address that Weigand had provided to AH. That check was endorsed with the hand-written designation "for deposit only" and deposited into Weigand's bank account via a Discovery Federal Credit Union Automated Teller Machine in Wyomissing, Pennsylvania.

As to the second check, AH texted Weigand to ask for the "name address and telephone number to where the money [needs] to be sent." Weigand texted back,

> Ok here u go 50 check made out to NW …..address is 314 S. Henderson rd #200 King of Prussia, pa 19406…..phone 610-860-9142… overnight it FedEx or UPS in order to track and u will be reimbursed. Let me know [soon] as u send and tracking number. Thanks and have a great trip. We will get together.

AH advised Weigand that she had "[s]ent $50,000 made payable to your name from Bank of America. Delivery expected on 7/14." AH then informed Weigand that "my bank shows that the check was delivered today." The check itself bore the address that Weigand had provided to AH. The deposit slip showed that Weigand had deposited the check, along with $400 in cash, on August 8, 2017.

In sum, the above constitutes substantial evidence that the mails were used to deliver the checks to Weigand.

### n.   **Count 3 in 20-248—Wire Fraud**

Count 3 in 20-248 charged Weigand with wire fraud. He asserts that his conviction under this count should be reversed. Mot 7. However, he does not develop any argument as to why. He merely states in a single sentence that he is entitled to a judgment of acquittal on this count. Since Weigand offers no argument, he has not met his extremely high burden here for reversing his conviction on this count.

### o.   **Count 4 in 20-248—Interstate Transportation of Stolen Property**

Count 4 in 20-248 charged Weigand with interstate transportation of stolen property. The government alleged that Weigand traveled to California where he induced AH to give him a check for investment purposes. Weigand returned to Pennsylvania with that check, deposited it, and then misused the funds for purposes unrelated to investment, including repaying funds that he had embezzled from a different client. The jury found Weigand guilty of violating the applicable statute, which criminalizes the transportation or interstate transfer of "any goods, wares, merchandise,

securities or money, of the value of $5000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. 18 § 2314.

Weigand argues that his conviction under this count should be reversed for three reasons.

First, he argues that there is no evidence that he transported the check over state lines. Weigand is mistaken. AH testified that she met Weigand in California and that she gave him the check in person. Banking records confirm that the check was deposited in Weigand's account in Pennsylvania and that Weigand made purchases in Pennsylvania on the same day the check was deposited. This on its own is sufficient evidence that Weigand transported the checks across state lines.

Second, Weigand argues that AH willingly gave him the check and that it therefore was not stolen. The applicable statute, however, covers more than goods that are stolen. It also covers goods that are taken by fraud, and the jury could have found that Weigand obtained the check by fraud based on the evidence admitted during trial - specifically, that Weigand induced AH to give him the check under the belief that he would invest if for her benefit, which he did not do.

Third, Weigand argues that the check was "merely a slip of paper" so it does not have the necessary value to be covered by the statute. Mot. 17. The Court is not persuaded by this argument. A check is not merely a piece of paper. A check is a security. *See* 18 U.S.C § 2311. And "securities" are expressly covered by the applicable statute.

In sum, this count is supported by substantial evidence because a reasonable mind might accept that Weigand obtained the check by fraud and then transported the check from California to Pennsylvania.

p. **Count 5 in 20-248—Wire Fraud**

Count 5 in 20-248 charged Weigand with wire fraud. He asserts that his conviction under this count should be reversed too. Mot 7. However, similar to Count 3 in 20-248, he does not

develop any argument as to why it should be reversed. He merely states in a single sentence that he is entitled to a judgment of acquittal on this count. Since Weigand offers no argument, he has not met his extremely high burden here for reversing his conviction on this count.

q. **Count 6 in 20-248—Interstate Transportation of Stolen Property**

Count 6 in 20-248 charged Weigand again with interstate transportation of stolen property. The government alleged that Weigand traveled to California, induced AH to give him a check for investing, took that check to Pennsylvania, and misused the funds. Weigand does not make any unique arguments for reversing his conviction under this count that the Court has not already rejected. Thus, the Court moves on to Wiegand's next argument.

r. **Sentencing Enhancement in 20-248**

Since Weigand committed the offenses alleged in counts 5 and 6 in 20-248 while he was out on bail, those two counts also charged a sentencing enhancement pursuant to 18 U.S.C. § 3147 for crimes committed while on bail. Through a special interrogatory, the jury found that Weigand committed both offenses while he was on release pending trial subject to a Court order notifying him of his release conditions. Weigand takes issue with the sentencing enhancement.

Specifically, Weigand argues that he was not convicted of these counts while on release because he was not found guilty until the end of the trial. Mot. 17. According to Weigand, the jury could not have found that he committed the charged offenses while on release because "there is no conviction until a sentence is imposed upon a defendant, and that has not yet occurred" in this case. Mot. 17. The applicable statute, however, does not require that Weigand be convicted of a crime while on release; it asks whether he was convicted of crime that he committed while he was released on bail. *See* 18 U.S.C. § 3147. Here, the jury found that Weigand committed the offenses under counts 5 and 6 while he was on release pending trial subject to a Court order notifying him of his release conditions. Thus, the sentencing enhancement is proper.

###### 2.   *Second Category - Arguments for a New Trial*

Having rejected all of Weigand's arguments for acquittal, the Court turns next to his second category of arguments for a new trial. Specifically, he points to two alleged errors that the Court made during trial.

####### a.  **Summary Witness**

Wiegand's first claim of error relates to the government's summary witness who testified on several summary charts produced by the government.

This case involved thousands of records, including bank statements, checks, and records of other financial transactions. The records were so voluminous that it would have been impractical for the Court and jury to review them all during the trial. As a result, the government used several charts to prove the content of the records pursuant to rule 1006 of the Federal Rules of Evidence. The charts acted as a summary for the numerous underlying records. They listed various information for each transaction reflected in the charts: the date of the transaction; the amount of the transaction; the source of the funds; and a description of the transaction. Several of the charts also listed the remaining balance of the accounts after the withdrawals and deposits. The government's summary witness testified that she calculated the balances by using simple addition and subtraction. She also testified that she reviewed the relevant bank records and used those records to create the summary charts presented during trial.

The charts also used color to classify the transactions based on which account the funds were eventually deposited into. Client funds that were "used for the benefit of Weigand" were colored red; client funds that were "used for the benefit of another client" were colored in yellow; and funds that were "used for the benefit of" the client who supplied the funds were colored in green.

Weigand objected to the summary witness' testimony on the grounds that it was improper expert testimony because the witness had not been qualified as an expert. The Court overruled that objection because the compilation of the summary charts did not require any special knowledge, training, or education and because the witness' testimony was not based on any scientific, technical, or other specialized knowledge. Weigand contends that the Court erred by overruling his objection and maintains that the witness gave improper expert testimony. Specifically, he cites to *United States v. Shulick*, 18 F.4th 91 (3d Cir. 2021) and argues that, under *Shulick,* the witness' testimony constitutes expert testimony because she made inferences about certain transactions and designated those transactions with different colors. This case, however, is distinguishable from *Shulick*.

In that case, Shulick contracted with the School District of Philadelphia to operate a school for at-risk students. *See id.* at 97. The contract provided Shulick with funds to operate the school and allocated how the funds were to be used. *See id.* Shulick misused the funds and was charged with, among other things, embezzling funds from a federally funded program. *See id.* at 98. The case went to trial, and a jury convicted him. *See id.*

During trial, Shulick called Frederick Hamilton as a summary witness to explain charts admitted under rule 1006 of the Federal Rules of Evidence. *See id.* at 106. The charts allocated certain shared costs across Shulick's business ventures to the budget for the school, and Hamilton was asked why he made those allocations. *See id*. The court, however, excluded Hamilton's testimony because he attempted to offer expert testimony even though he had not been qualified as an expert witness. *See id.* Shulick appealed the court's decision, and the Third Circuit Court of Appeals affirmed. *See id.*

The Third Circuit reasoned that Hamilton's testimony was properly excluded as expert testimony because it "would have required the retroactive application of business and accounting principles." *Id*. at 107. Moreover, it involved "the application of Hamilton's own formulas." *Id.* at

106. The "testimony would have involved [Hamilton] explaining his analytical assumptions and professional opinion, based on his accounting expertise, that it was appropriate to allocate some of Shulick's general (and even unrelated) business costs as expenditures for the Southwest school." *Id*. In addition, Hamilton's testimony would have been "based on information that is not available from the records." *Id*. None of this reasoning can be said of the summary witness' testimony in this case.

The witness in this case essentially took numbers from the underlying records and plugged them into the summary charts, something that does not require any special training or knowledge. The only application of the witness' own judgment to the charts was her color designation of the transactions, but that was an unsophisticated application based on her own rational perception. Although the summary witness had professional training, the color designations did not require any special training to make.

The witness explained that she based the color designation on which account the funds were drawn from and which account the funds were deposited into. For example, if the funds came from an account belonging to client "A" and were deposited into an account belonging to client "A," then the transaction was colored green and labeled as "used for the benefit of" that client. If the funds came from an account belonging to client "A" but were deposited into an account belonging to a different client, then the transaction was colored yellow and labeled as "used for the benefit of another client." If the funds came from an account belonging to a client and were deposited into an account belonging to Weigand, then the transaction was colored red and labeled "used for the benefit of Weigand." Lastly, if the summary witness was not able to trace the funds or was unsure where the funds came from or ended up, then the transaction was left white and unlabeled. Such a determination did not require the application of business or accounting principles. Nor did it require the application of the witness' own complex formulas or analysis. The summary witness simply looked at which account the funds came from and which account the funds ended up in.

Importantly, the color designations were based on the underlying records, not on information that was not available from the records. The witness' decision to highlight certain transactions red and others green did not require her to consult records beyond the underlying bank records. The fact that the witness made a simple inference of who the transaction ultimately benefitted based on who the account belonged to does not automatically raise it to the level of expert opinion. *See, e.g., United States v. Radseck*, 718 F.2d 233, 239 (7th Cir. 1983); *see also United States v. Stierhoff*, 500 F. Supp. 2d 55, 68 (D.R.I. 2007) (allowing summary witness to offer conclusions based on his observations even though witness was not qualified as an expert), aff'd, 549 F.3d 19 (1st Cir. 2008); *United States v. Hevener*, 382 F. Supp. 2d 719, 730 (E.D. Pa. 2005).

Even if the Court did err by allowing the government's summary witness to designate the transactions using varying colors, Weigand has not shown that the error caused actual prejudice. The transactions highlighted in red, yellow, and green are rather insignificant when put into context of a trial that lasted twelve days. The color designations appear in only eight charts; the color designation in those charts is only one aspect of the charts; the jury saw and reviewed hundreds of other exhibits; the jury listened to 19 recorded telephone conversations; and the jury heard hours of testimony from numerous witnesses. To put it plainly, the color designations in the summary charts are a small pebble in the mountain of incriminating evidence against Weigand. Even without the color designations, the government's case against Weigand would remain strong, including the factual information that would still have been displayed on the charts had the colorized highlighting been removed.

Moreover, Weigand had the opportunity to cross examine the witness. Indeed, Weigand's counsel spent several hours cross-examining the witness and asked specifically about the color designations, challenging the accuracy of the charts. The Court instructed the jury that "the accuracy of the charts [have] been challenged. You must decide how much weight, if any, you will

give to them. In making that decision, you should consider the testimony you heard about the way

in which the charts were prepared." It also instructed,

> The government presented certain charts in order to help explain the facts disclosed
> by certain documents and audio recordings which were admitted as evidence in the
> case. The charts are not themselves evidence or proof of any facts. If the charts do
> not correctly reflect the evidence in the case, you should disregard them and
> determine the facts from the underlying evidence.

Thus, it is not a reasonable probability that the charts, with or without the color highlighting,

influenced the verdict in this case. As a result, Weigand has not met his extremely high burden of

proving that a new trial is warranted even if the color designations were improper.

Weigand also argues that the witness acted as an expert by deciding which accounts and

transactions to include in the charts and which to omit. The Court, however, is not persuaded by this

argument either. "A Rule 1006 summary chart need not accurately reflect all the facts in the case; it

merely must accurately represent the facts that it purports to summarize." *United States v. Lynch*,

735 F. App'x 780, 786 (3d Cir. 2018). The government prepared the charts to support its own

theory of the case, not Weigand's. If Weigand wanted to show the jury his side of the story, he had

the opportunity to do so during cross-examination, which he did. *See id*.

**b.  Weigand's Defense Theory**

Weigand's second claim of error is that he "was denied the ability to put on his defense that

the activities charged in the Indictment were in large part normal business practice, or a course of

conduct developed between [him] and certain clients with the need for a more hands on advisor."

Mot. 24. Weigand's defense, at least to the bank fraud, wire fraud, and mail fraud charges, was that

his clients' funds were eventually returned to them "in the form of annuity investments." Mot. 26.

According to Weigand, the Court sustained multiple objections to evidence and questioning that

would have demonstrated how he used his clients' funds "for a client investment, thereby

exchanging dollars for an annuity or other insurance product." Mot. 25.

The government argues that the Court correctly sustained its objections because the proffered evidence and questions related to a "defense of repayment," which is irrelevant in a prosecution for fraud. *See United States v. Lucas*, 709 F. App'x 119, 123 (3d Cir. 2017) ("We have never held that evidence of repayment is relevant when considering a person's intent to defraud another, a proposition which has been squarely rejected by several of our sister courts."). Weigand, however, argues that the "purchase of an investment with funds and the receipt of that investment is NOT repayment, it is a transaction and that [he] was barred upon government objection." Mot. 25.

Weigand's argument misses the point of this case. The indictments allege that he obtained the victims' funds by, among other things, impersonating them and forging their signatures on checks and other documents. According to Weigand, everything he did was "routine business practice." Mot. 27. If there was evidence that it was a routine business practice for Weigand to impersonate his clients, and his clients knew of that practice and approved, then that would indeed be relevant. The problem for Weigand is that he offered almost no evidence to support this theory.

One possible exception is his first exhibit. *See* Def. Ex. 1 (also admitted as Gov. Ex. 1104). According to Weigand, Defense Exhibit 1 is a contract between him and AR "that gave him carte blanche over all her assets and investments." Mot. 26. The Court granted Weigand's request to admit Defense Exhibit 1 into evidence. It also allowed Weigand's counsel to question AR extensively about the exhibit, overruling several government objections. The jury considered Defense Exhibit 1, along with the other admitted evidence, and they found Weigand guilty of each count.

Had there been any other evidence to support Weigand's theory that his clients knew of and approved of his "routine business practices," then the Court would have allowed that evidence to go the jury because it would have been relevant to a legitimate defense—that Weigand did not actually *deceive* his clients. The only time the Court stopped Weigand from admitting evidence (or asking

witnesses certain questions) was when the government objected, and the Court determined that the evidence (or questions) violated the Federal Rules of Evidence. The Court cannot engage in any further analysis than this because Weigand does not specify any objection or objections that he believes the Court ruled in error on.

Thus, contrary to Weigand's assertion, this Court did not deny him the ability to put on a defense. Weigand was allowed to cross-examine each government witness; he was allowed to make objections; he was allowed to admit relevant evidence; he called several of his own witnesses; he submitted proposed jury instructions; and his counsel presented both opening and closing argument.

### 3. Third Category - Argument for Hearing

Weigand's third and final category of argument relates to alleged evidence that he believes the government wrongly withheld from him.

The government's summary witness testified that she was not the first person to review Weigand's bank records in preparation for completing the summary charts used during trial. Before she was assigned to the case, another government investigator, Mr. Armstrong, worked on the case. The summary witness testified that she received "paper and electronic documents" from Armstrong when she inherited the case from him. She described the documents from Armstrong as "summary type write-ups" and "spreadsheets." She also testified, however, that she examined the underlying bank records for herself in order to "create [her] own charts" and that she did not even review all the material Armstrong sent her. It is unclear how far Armstrong took the assignment or what determinations Armstrong made, if any, that would have been different from those made by the summary witness. During a sidebar, Weigand complained that he did not have any of Armstrong's "spreadsheets" and moved for a hearing on the issue, arguing that Armstrong's material was *Giglio* and *Brady* evidence. After hearing argument from both sides, the Court denied Weigand's request, determining that the material at issue was not *Giglio* or *Brady* evidence.

Weigand now asks again in his Motion that the Court hold a hearing on the matter because "the material is obviously *Brady* and/or *Giglio* material which would have brought the summary witness' testimony into question."[6] Mot. 28.

*Brady* evidence is evidence that is both exculpatory and material. *See United States v. Moyer*, 726 F. Supp. 2d 498, 512 (M.D. Pa. 2010). *Giglio* evidence is a subset of *Brady* and is evidence that could affect the jury's judgment of the credibility of a crucial prosecution witness. *See United States v. Friedman*, 658 F.3d 342, 357 (3d Cir. 2011). Both types of evidence must be disclosed to criminal defendants if it is within the government's possession. In order to prove that the government failed to disclose such evidence, a defendant must show that (1) the evidence is favorable to the defendant, (2) the evidence is material, and (3) it was suppressed by the prosecution. *Id*. at 358. Weigand fails all three elements.

As to the first element, there is no evidence that Armstrong's materials are favorable to Weigand. In his Motion, Weigand asserts that Armstrong's materials "supported the defense theory of business practices," but nothing in the record supports that claim. The summary witness testified that she received "spreadsheets" from Armstrong but that she did not even review all of them. The summary witness did not testify that Armstrong reached any conclusions from his research that differed from her own. Indeed, there was no testimony of what exactly Armstrong's material contained other than that it was based on Weigand's bank records. Weigand fails to meet the second element for the same reasons he fails to meet the first. Most importantly, Weigand has not shown that the materials were suppressed.

---

[6] The government points out in its Response that the Court should deny this request because it has already been denied for the reasons on the record and that the request is essentially a "motion for reconsideration," which is untimely and does not meet the standards for a motion for reconsideration. *See* Resp. 68. The Court agrees. Nevertheless, in order to be thorough, the Court addresses the merits of Weigand's argument in this Opinion.

The finalized summary charts, and Armstrong's materials, were based on underlying bank records, all of which Weigand had in his possession. The Third Circuit addressed an almost identical issue in *Dukes v. Pappas*, 405 F. App'x 666 (3d Cir. 2010).

In that case, Dukes brought a *Brady* claim based on the SEC's refusal to disclose a spreadsheet that cataloged "Dukes' companies' financial transactions." *Id*. at 668. The Third Circuit held that refusing to disclose the spreadsheet was not a *Brady* violation because Dukes had access to the information used in creating the spreadsheet. "While Dukes may have found it more convenient to work from the government's spreadsheet than from the raw financial information that he either already had or could have acquired with reasonable diligence, *Brady* does not require the government to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own." *Id*. at 669 (cleaned up).

Armstrong's materials amount to work product, and Weigand is not entitled to that work product because the underlying bank records used to create the materials were already in his possession.

Lastly, the Court notes that Armstrong's materials could not have been used to properly impeach the summary witness because she did not rely on them to create the summary charts. She testified more than once that the only records she used to create the summary charts were the underlying bank records that were admitted into evidence and that were available to Weigand.

## V.    CONCLUSION

Weigand's convictions on each count under both indictments are supported by substantial evidence because a reasonable mind might accept that Weigand was guilty of each count based on the evidence presented at trial. Also, Weigand is not entitled to a new trial because the Court did not commit any errors during his trial. To the extent that the Court did err, Weigand has not shown that those errors influenced the verdict in this case. Finally, the Court denies Weigand's request for a

41
100422

*Brady* or *Giglio* hearing because Weigand has not shown that the alleged evidence at issue is favorable to him, is material, or was not already in his possession. For those reasons, and the reasons given above, Weigand's Motion is denied.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge